## CHANDLER *v.* POMEROY *et al.*

*(Circuit Court, D. New Jersey. June 1, 1891.)*

**SPECIFIC PERFORMANCE—INEQUITABLE CONTRACT.**

A testator directed that $50,000 should be placed at interest for the benefit of his wife during her life, and at her death the principal to be divided equally among his three younger children, E., J., and K.; that $30,000 should be placed at interest, and the income paid to his eldest son G. during his life; that his executors should sell real estate, and place the first $100,000 received therefrom at interest, $50,000 each for J. and K.; that all the rest of his property should be divided equally among the three younger children; that his homestead should be kept up for the younger children and widow; and that subject to this right, it was to be included in the residue of the estate. The testator's personalty amounted to $480,000, and the real estate to $355,000. E., who was one of the executors, took charge of the personalty, put $50,000 at interest for his mother, and $30,000 for his brother G., and paid each of his sisters $2,000 per annum. The widow died, and he took possession of the $50,-000 held in trust for her. The sisters finally received $50,000 each from him, and, being unable to obtain any further settlement, they sued him, pending which he died, leaving a will by which he gave the rest of his estate to his brother G. to the exclusion of his sisters, from whom he had become alienated, but who at that time were each entitled to at least $100,000 from him. The complainant then, as the representative of G., whose executor he afterwards became, negotiated the contract in suit with defendants J. and K., by which they, in terms, gave up their claim against E.'s estate, the $50,000 already received by each of them, and their right under their father's will to have $50,000 apiece raised for them out of the real estate, and agreed that G. should stand on an equality with them, not only as against E.'s estate, but also as against their father's estate from the time of his death. The defendants testified that they did not understand the effect of the agreement when they signed it; that they were dissuaded by complainant, in whom they had absolute confidence, from consulting counsel; that their sole intent was to divide up with their brother G. "what was left" of their father's estate, and not to surrender anything they had already received. In pursuance of the agreement, the assets in E.'s hands at his death, $380,688, was divided into three parts, and distributed between J., K., and G. *Held,* that the contract, according to the evidence, was obtained by misrepresentation and deception, and was manifestly inequitable, and the court would not decree a specific performance of it further than it already had been performed by the parties.

In Equity. On bill for specific performance.

Cause argued by consent before Hon. JOSEPH P. BRADLEY, Circuit Justice, at his chambers in the city of Washington, December 30, 1889, and held for advisement.

*C. C. Bonney* and *Guild & Lum*, for complainant.
*Geo. W. Smith* and *John Manard Harlan*, for defendants.

BRADLEY, Justice. The bill in this case is filed by Frank R. Chandler, as trustee and executor of the last will and testament of George P. Pomeroy, deceased, against Josephine Pomeroy, Julia Pomeroy Morrison, and her husband, William F. Morrison, and Alfred Mills, surviving executor of the last will and testament of George Pomeroy, deceased. Its primary object is to enforce and carry out an agreement alleged to have been made by and between the said George P. Pomeroy, on the one part, and the said Josephine and Julia, (with her husband,) on the other part, in relation to the division and settlement of the estate of the said George Pomeroy, father of the said George P. Pomeroy, Josephine, and Julia, and the estate of Edward Pomeroy, deceased, their brother. The agreement sought to be enforced is alleged to have been made by certain telegraphic communications and correspondence between the parties in March and April, 1887, culminating in a written agreement dated April 13, 1887, which is set out in the bill. The agreement relied on is that which is supposed to have been arrived at in this correspondence, and not that which is contained in the written document afterwards signed and executed by the parties. But the rule is so imperative that previous negotiations and correspondence are merged in a written agreement finally executed, that I have no hesitation in deciding that the prayer of the bill cannot be granted in the aspect in which the complainant has presented his case. But as all the facts are set forth, including the written agreement, and as the bill prays for general and alternative relief, it is perhaps allowable to look at the case as if it were based upon the written agreement itself, which the complainant contends is not repugnant to, but consistent with, the agreement first made and relied on.

The facts of the case, as exhibited by the pleadings and evidence, may be briefly stated as follows: George Pomeroy, of Madison, Morris county, N. J., died June 24, 1880, leaving a large estate, real and personal, and leaving his wife, Abba S., and four children, George P., Edward, Julia, and Josephine, him surviving. He also left a will, bearing date July 22, 1875. Aside from unimportant legacies and directions, the main provisions of the will are as follows: (1) Securities to the amount of $50,000 were directed to be placed with the New York Life Insurance & Trust Company, in trust for the testator's wife during her natural life, the interest to be paid to her, and upon her death the principal to be divided equally between the three younger children, Edward, Julia, and Josephine. (2) Securities to the amount of $30,000 were directed to be placed with the same company in trust for the testator's son George during his natural life, the interest to be paid to him, and at his death the principal to be equally divided between the said three younger children and the survivors of them. If, at the time of the division, either of the three children should have died leaving issue then surviving, such issue to take by representation. (3) The testator empowered his executors, or the survivor of them, to sell his real estate,

and to place the first $100,000 received from the said sales with the said trust company in trust, $50,000 thereof for Julia, and $50,000 for Josephine, during their natural lives, respectively; and, at the death of either, to pay the principal of her share to her issue surviving her, (if any,) and if no such issue, to pay the same to the surviving daughter and to Edward, and the survivors of them, or their issue. (4) All the rest and residue of his property, real and personal, the testator gave to the said three younger children, Edward, Julia, and Josephine, their heirs and assigns, to be equally divided between them; but, if either should die before the testator without issue, the said residue was given to the survivors. These provisions of the will were subject to a specific direction with regard to the testator's homestead at Madison, which he desired to be kept up by the said three younger children so long as they could live harmoniously together, his wife living with them; and a certain part of the homestead described in the will was not to be sold, leased, or partitioned without the consent of his wife and of said three children; and, if either of them should marry, he or she should not remain in the homestead without the consent of the others. Subject to this specific direction, the homestead was included in the residue, with the rest of the property not otherwise disposed of. The testator appointed his son Edward Pomeroy and Alfred Mills the executors of his will, and after his death they regularly proved the same. The testator's wife and all his children survived him. George, the eldest, soon after the testator's death, married a Miss Cowles, of Cleveland, daughter of Edwin Cowles, and had a son by her, born May 27, 1881. The wife of George shortly after died.

The bill states that the testator's property, at the time of his death, amounted, as estimated by himself, to about $538,000 of personal estate, and $355,000 of real estate. The inventory of the personal property made by the executors, however, amounted to only about $480,-000. Edward took charge of the personal assets, and placed with the New York Life Insurance & Trust Company, as directed by the will, securities to the amount of $50,000 in trust for the widow, and also to the amount of $30,000 in trust for his brother George, and paid to his sisters annually about $2,000 apiece for their support. He engaged in the business of a broker in New York, and his sisters became apprehensive that he used the funds of the estate for his own purposes. The widow having died in February, 1883, he took possession of the $50,000 held by the New York Company in trust for her. The sisters, Julia and Josephine, on the 2d of February, 1885, received from Edward $50,000 apiece in securities. They must have been entitled at that time to at least $150,000 apiece from the personal estate. Being unable to procure any further settlement from Edward, in September, 1885, they instituted a suit against him in the supreme court of New York. This suit was pending at the time of Edward's death, which took place 6th of March, 1887. He died without issue and unmarried, leaving a will, dated October 23, 1886, by which, after some pecuniary legacies, amounting in the aggregate to $6,500, he gave all the residue of his estate to

his brother George, (who was then in Paris,) and made him his sole executor. He had become alienated from his sisters, probably on account of their efforts to enforce their claims against him. Julia had in the mean time married Rev. William F. Morrison. It is apparent that when Edward died his sisters were justly entitled to demand from him or his estate at least $100,000 apiece, without including interest; and their brother George, as Edward's chief legatee, was only entitled to what remained of his estate after they were satisfied and paid.

But now happened a most extraordinary thing. Laying out of view the preliminary correspondence before referred to, a written agreement was brought about between George P. Pomeroy and his sisters, dated April 13, 1887, (but not executed until May 2, 1887,) by which they, Julia and Josephine, (as the complainant, Chandler, contends,) gave up their claim against Edward's estate; gave up the $50,000 apiece already received by them; gave up their right to have $50,000 apiece raised for them out of the real estate; and agreed that George should stand on an equality with them, not only as against Edward's estate, but as against their father's estate from the time of his death in 1880, and that they should be charged with all that they had in any way received, together with interest thereon, while George should only be charged with what he had received, and interest thereon, and not with what Edward (whom he represented) had received; George having received only the interest on the trust fund of $30,000 left for his use by his father. And this suit is brought to compel a specific performance of that agreement, or, rather, of the agreement, substantially the same, supposed to have been arrived at in previous correspondence. Looking at the case at large, this seems to be one of the most inequitable agreements ever extracted from confiding and helpless females. The following are the most material parts of it: It contains, first, a number of recitals relating to the family history, among which is one to the effect that Edward Pomeroy, at the time of his death, was indebted to Julia P. Morrison, Josephine Pomeroy, and George P. Pomeroy, or some or one of them, in a sum or sums, the amount of which was unknown to the parties. So far as this recital affirms that Edward Pomeroy was indebted to George, it is unsupported by any evidence whatever. It was evidently inserted for the purpose of giving some color to the agreement that follows. After these recitals the agreement proceeded in the following terms:

"Now, therefore, in consideration of the premises and other covenants and agreements herein set forth, it is covenanted and agreed by each of the parties hereto that the remainder of the estate of George Pomeroy, deceased, shall be equally divided between his said three living children and heirs at law as of the date of his death; and, in order to arrive at the interest each should be entitled to at the date of these articles of agreement, it is agreed that each of the said children shall be charged with the amount in value that he or she may have received from the estate last aforesaid, together with interest on such sum at the rate of six per cent. per annum, payable annually, from the date of the receipt thereof to the date of these articles, and that the said will of George Pomeroy, deceased, shall be disregarded, so far as the same may be done by the parties hereto, to correspond with the provisions of this agree-

ment. It is further covenanted and agreed by the parties hereto that the estate of Edward Pomeroy, deceased, shall be divided and distributed equally between his said heirs at law, share and share alike, after the payment of his just debts and sundry legacies of six thousand five hundred dollars ($6,500) aforesaid, and that his said will shall be disregarded in so far as it conflicts with the terms of this agreement. It is further covenanted and agreed by the parties hereto that in case it is found that the personal property of said George Pomeroy, or of said Edward Pomeroy, cannot be equally distributed in kind, then so much of the same as may be necessary shall be sold, and the proceeds thereof divided equally between the parties as herein provided. It is further covenanted and agreed that the real estate of the said George Pomeroy, deceased, and of Edward Pomeroy, deceased, wherever situated, and by whomsoever of the parties hereto held, shall be conveyed by good and sufficient deeds of conveyance by each of the parties hereto, an undivided third part to Julia P. Morrison, an undivided third part to Josephine Pomeroy, and an undivided third part to George P. Pomeroy, so that said last-named parties shall hold the entire title to said real estate as tenants in common, and that if the title to said real estate, or any portion thereof, is held by any other party, that the same shall be considered as belonging to the parties hereto in the proportion stated, and that it shall be so conveyed. It is further covenanted and agreed that in the division of the said estate the proceeds or revenue to be derived from the trust fund for the benefit of George P. Pomeroy, Julia Pomeroy Morrison, and Josephine Pomeroy, created by the will of George Pomeroy, deceased, shall be treated as a joint fund, and divided equally between the said last three parties; and, so far as it lies in our power, we, the parties hereto, covenant and agree that the said trust fund shall be considered and be the joint fund of the said last three parties."

This agreement has some curious aspects. It will be observed that it sets out by specifying only "the remainder" of George Pomeroy's estate to be equally divided between his three living children; but it goes on to declare that each of the children shall be charged with the amount that he or she may have received, together with interest; which, to say the least, is a very singular qualification of "the remainder." Now, as we shall see, the defendants understood that the division was to have respect only to "what was left" at that time,—to the "remainder," properly so called,—exclusive of what had been actually received, and exclusive of the trust fund of $100,000 which was to be raised by sales of real estate for the benefit of the two daughters. It will also be observed that the last clause deals separately with "the proceeds or revenue" of that fund and the *corpus*, or principal, thereof; stipulating for a division of the former, but only a division of the latter "so far as it lies in our power." It will be seen that the defendants understood that the *corpus*, or principal, of that fund was not to be included in the division at all, but was to be set apart for them, in trust, according to their father's will. They insist that in regard to both of these matters they had no idea, when they signed the agreement, that it was different from their understanding of what it was to contain. Then as to the real estate, the sweeping terms of the agreement would seem to cover the homestead, as well as the residue; whereas they never understood that they were to be deprived of the privilege of living in the homestead according to the terms of their father's will.

George P. Pomeroy was living when the agreement was executed, and signed the same; but it was not of his getting up. He had a disease of the brain which unfitted him for business. The complainant, Chandler, (whose wife was a cousin of the Pomeroys,) acted for him in the whole matter, and now appears in this suit as his executor, and as one of his residuary legatees. He prepared the paper, and produced it for signature, and, according to the weight of the evidence, induced the defendants Julia and Josephine (who will hereafter be called the defendants generally) to sign it without consulting counsel, actually dissuading them from consulting counsel. It is true that his own testimony is otherwise; but I conceive the weight of the testimony to be as stated. It is also in evidence, and according to what I conceive to be the weight of the testimony, that the said defendants were under a misapprehension as to the terms of the agreement. They understood that the division to be made between them and George related to what was left of the two estates. They had never, as they allege, seen the agreement before it was produced for them to sign. They had placed the utmost confidence in the complainant. When it was read over to them in the evening, after they had signed it, they were greatly surprised ("amazed" is the expression) at its terms, and threatened to repudiate it, and to seek legal relief for that purpose; but Chandler reassured them, represented that the effect of it was different from what they apprehended, and quieted their alarm. Their confidence in him induced them to trust to what he said. These matters will be more fully shown hereafter.

One of the means employed to induce the defendants to come to a settlement was the magnification of the costs and expenses which they were in danger of incurring by carrying on the suits against Edward's estate. It is admitted in the bill as follows:

"And your orator further shows that in and about said suits large expenses and counsel fees had been incurred, and your orator, on looking into said controversy, and the character and condition of said suits, was convinced that unless said controversy could be settled, and said suits brought to an amicable termination, a large portion of the estate in dispute would be wasted in costs, expenses, and the losses incident thereto."

This corroborates the following statement of the answer:

"These defendants admit and charge that said complainant, and others acting in complainant's interest and that of said George P. Pomeroy, did shortly after said Edward's death represent to these defendants that the expense of said litigation would be very large, and that if no settlement thereof was made the estate would be entirely eaten up by lawyers; and that such representations were made as an inducement to these defendants to settle said suits."

In connection with the representations as to the frightful expenses of the litigation was the insinuation by the complainant of the desire of the defendants' lawyers to continue the litigation in their own interest, and the raising of a suspicion of their integrity, and the dissuading of the defendants, as mentioned above, from taking their advice or consulting them in regard to the proposed agreement. Mrs. Morrison says:

"He [Chandler] distinctly and frequently advised us to consult with nobody in regard to this settlement. The reason he gave was that there would be an

expense attending it; that, if we had decided to divide up what was left, there was no need of having counsel. He also said our lawyers would advise not to settle in that way. * * * All the reason Mr. Chandler gave why our lawyers would advise against the settlement was that it would be stopping the litigation they had in hand, and therefore he thought they might not approve it. * * * The attitude of Mr. Chandler, as I understood it, in these negotiations, was that he was a peace-maker. He was George's agent, and had come on to try and settle the question without any further law, and bring us together again. His attitude was that of a friend to us all."

And having thus the entire confidence of the defendants, it was comparatively easy to bring about the result he desired, and make them believe that they desired it more than he did. Mr. Morrison confirms his wife's testimony as to Chandler's prevailing with them not to consult their lawyers. Josephine Pomeroy, in her testimony, distinctly says:

"Mr. Chandler advised us not to consult any counsel prior to signing the agreement, and we promised him not to do so, and followed his advice."

This testimony is further corroborated by the lawyers themselves. Mr. Shoudy says:

"My advice was not sought as to the propriety and advisability of that agreement."

Chandler accompanied the defendants to the lawyers' office. Shoudy says:

"There was no discussion by me, or in my presence, of the agreement or its special provisions. I did not make a careful examination. I was not asked to do so. I do not exactly remember what brought out the remark, but I think the general plan of settlement was spoken of by Mr. Chandler; and Mrs. Morrison, I think, asked me what I thought of it; and I told her I thought it was a tremendous leap in the dark. I did not assume to advise; I had not sufficient facts before me to enable me to do so. * * * The ladies spoke of Mr. Chandler as a very warm friend, and they thought he was looking out for their interest. * * * I was instructed either at that time, or soon after, to dismiss the suit against Edward."

The defendants were in a condition to be easily wrought upon. In the first gush of feeling which ensued upon Edward's death, after his refusal to see them on his death-bed, they were open to excited impressions. The overanxiety of officious friends for their mental peace and welfare excited them still more. They were advised to give up their claims against Edward and his estate, and they no doubt, at first, under the sway of these influences, were ready to surrender all their rights, and make an equal division of everything with their brother George. But that was not the final view or purpose under which they acted at the time of executing the agreement. At this time they had no intention of being brought into account for what they had received in the past, nor of giving up their interest in the trust fund to be raised out of the real estate. It was "what was left"—that is, the personal securities which remained in Edward's hands at his death, and which they had in their own hands—which they had principally in view when they assented to an equal division, and which division was in fact made immediately thereafter, as will be shown hereafter.

Another of the inducements held out to the defendants Julia and Josephine to bring them to an agreement to divide equally with George was the suggestion that Edward died very rich; whereas, if he had paid his sisters their just dues, the probability is that he would have had very little, if anything, left. It is contended, however, that neither party knew what the condition of his estate was, and therefore the chance was equal on both sides. It is certain that the defendants were entirely in the dark on the subject, and the risk to them was very great, even in their point of view, that the agreement was to extend only to the personal estate. Chandler also protests, in his evidence, that he knew nothing about Edward's circumstances. As to details, this may be true; but it is hardly to be believed that he had not some general knowledge on the subject. He was intimate with the family. He and Edward had been partners together in the grain commission business in Chicago, and the firm had failed. In the settlement of its affairs, Chandler must have been interested to know about Edward's ability to respond to their mutual liabilities. It would be very strange if he did not know something about Edward's doings, and whether he had amassed a large fortune or not. Besides, it is hardly probable that a shrewd business man like him would have advised George to sign the agreement in question if there had been any probability of Edward's suggested wealth, or even a possibility of it. It is difficult to believe that he did not well understand that he was making a very advantageous bargain for George. He took care not to become the representative of Edward's estate until the agreement was signed; but, as soon as it was signed, he at once took out letters of administration *cum testamento annexo* upon said estate, George P. Pomeroy having renounced the executorship. Looking at the history of the whole transaction, it is not to be believed that Chandler blindly urged forward the consummation of the agreement; while it is undoubtedly true that the defendants had their imaginations excited by the flattering suggestions as to Edward's wealth which were held out to them, and, being induced to avoid any advice from their lawyers, they fell into the trap, and executed the agreement without due consideration. The evidence of the defendants as to what took place after the agreement was signed bears marks of truth on its face, and is interesting in this connection. Josephine Pomeroy says:

"I first read the agreement of April 13, 1887, the evening of the day on which we signed it. I was in my sister's bedroom, and she read it aloud. Mr. Morrison, Mr. Chandler, my sister, and myself were present. My sister read it aloud at Mr. Chandler's request. * * * Mr. Chandler said his object was to explain it to us. She read it through. A great deal was said. The first clause that surprised us very much was the one in regard to being charged with moneys from the time of father's death. We were perfectly amazed at finding such a thing. We said we would never submit to anything of that kind. We repudiated it on the spot. We said we would see a lawyer the next day and have it annulled; we would not endure any such thing. Mr. Chandler asked us how much we had had from the estate since father's death. * * * Mr. Chandler said * * * there would be a large balance coming to us. We were much pleased to hear that. * * * I know we were exceed-

ingly indignant, but when he smoothed over matters in that way we believed him. There was another clause, relating to the trust funds, that he explained by saying it referred to the interest on the trust funds. We asked him what it meant, to explain it to us, and he said it did not refer to the principal at all; it was only the interest on those two funds; that it was to equalize the income so as to make George feel more pleasantly towards us; to think that the incomes were more equalized. * * * After that the securities were pooled and divided. The income from our trust funds and from George's trust fund were also divided, and each of the three received one-third up to the last payment, just before my brother died, [meaning George.]"

Mr. Morrison testifies as to the same interview as follows:

"George retired very early after dinner. Then Mr. Chandler went into my wife's bedroom, and asked her for a copy of the agreement, and said there were some points in it that he thought she did not understand. Josephine and I were also present. My wife got the agreement for him, and my recollection is that he turned to the points about charging each one with the amounts she or he had had since her father's death, and about the trust funds. Those seemed to be the matters which he thought they did not understand. As soon as this matter of back charges was suggested, the two ladies became very indignant and mad; told Mr. Chandler they would never submit to that,—that is, being charged back to the time of their father's death; that it had never been so explained to them; that they had never so understood it, but that they were 'dividing up what was left,' emphasizing that word repeatedly; that, if he ever attempted to force this, he could only do it by law through the courts; that they repudiated that feature,—they never meant it; never intended it; didn't know it was in the agreement; didn't know anything about it; it was news to them. It came out that night. Then about the trust funds, they said they could not understand that,—why they had got to give up part of the income of the larger trust funds, and why George had to give up part of the income of the smaller trust fund, which they knew he only had a life-interest in. Mr. Chandler told them that that was to equalize their income; that George would give up more at that time, as his $30,000 trust fund yielded about $2,100, and only about $25,000 had been placed in trust towards $100,-000 which was to be raised for the two ladies; and he talked very smoothingly, and quieted them about this matter of the trust funds. The other matter about the back charges they fiercely resented all through. There were some pretty hot words. Mr. Chandler sat there rubbing his hands, and seemed very well satisfied. 'Well, you have signed it, you have signed it,' he would say. They vehemently protested about this part of the agreement, and said it was not their understanding, and he would chuckle and say, 'You have signed it.' "

From this it is evident that the defendants were made to believe that the principal of the trust funds was not affected, and that the provision about back charges all operated to their benefit. The whole scene is a striking commentary on the pertinency, if not excellency, of the advice given to them not to consult their lawyers. As for Mr. Morrison himself, though present, he explains that he took no part whatever in the negotiations, or in the management of his wife's business affairs, except to execute and carry out what had been determined on by her. Of course, Chandler in his testimony (for he is called to rebut all this) puts a different gloss on these transactions. It seems to me, however, that there is good ground for believing that the general tenor of the defendants' evidence is to be relied on. And the conviction is strongly forced upon

my mind that the defendants were greatly deceived and taken in when they were induced to execute the agreement in question. Letters of the defendants were produced, it is true, which, taken by themselves, might lead to a different conclusion; but how they came to be written, for what purpose, and what was the tenor of the rest of the correspondence, does not satisfactorily appear. One of them, to which some importance is attached, written by Mrs. Morrison to her aunt Martha, (Chandler's mother-in-law,) is testified to have been dictated by the complainant himself. Josephine says: "I heard Mr. Chandler beg my sister to write that. * * * She did it all to please Mr. Chandler." Notwithstanding these letters, and notwithstanding the testimony of the plaintiff, the impressions which the whole evidence, taken together, has left on my mind are as before stated. Two of the witnesses, Chapman and Shoudy, were entirely disinterested, and they corroborate the testimony of the defendants. They distinctly say that the division to be made between George P. Pomeroy and his sisters was only to relate to what was left of the estate. I am satisfied, as contended by the defendants, that they understood, when they signed the agreement, that the division contemplated by it related only to what was left without going into past transactions, or interfering with their trust fund; that they misapprehended its purport, if construed as contended by the complainant; and that they were induced to sign it without consulting their counsel; and that when they signed it they did so with the greatest confidence in Chandler as a friend to them and their interests, as well as to George and his interests. I cannot rid myself of the conviction that that agreement was brought about by contrivance and deception. Many other circumstances not adverted to go to corroborate this conclusion.

Under this view of the case, I cannot hesitate to refuse a decree for specific performance of what I regard as an iniquitous agreement. As far as it has been actually carried out by the parties, they must be held concluded. The defendants are concluded by the division of assets made in May, 1887. That was understood to be an equal division of the remaining personal assets of both estates,—the father's estate and Edward's estate. The defendants produced, and put into the common fund, bonds and stocks estimated at $109,153.33, being the $100,000 and its accretions which they had received from Edward in February, 1885; and the complainant produced what was found of the estate in Edward's hands at his death, making together $380,688 or thereabouts. This was divided into three equal parts of $126,896 each, and each party received his or her share; the defendants Julia and Josephine each receiving securities to the amount of $72,896, and cash to the amount of $54,000, and the complainant the like amount in behalf of George P. Pomeroy. There is very little doubt in my mind that all this property came from the father's estate. It was not nearly equal to the amount which Edward ought to have had in his hands, and was accountable for. The portion received by the complainant for George was no doubt so much clear gain to him. The defendants regarded and understood this division of assets to be a complete execution of the agreement and settlement of the

estate, so far, at least, as the personal property was concerned; and that by accepting this division they relinquished all further claim upon Edward's estate. In making this settlement, they supposed and believed that no disturbance of their father's will would ensue; and they expressly declare, in their answer, that it was never the intent to disturb that will, notwithstanding some expressions in the agreement that had a contrary appearance. This conviction seems to have been impressed upon the defendants in some manner or form which gave them a just reason for entertaining it. The complainant cannot deny that, notwithstanding the agreement, it was the intention of the parties to carry out the will. The bill of complaint has the following striking passage:

"And your orator further shows that, in drawing up said document, certain expressions were used therein as though it was the purpose thereof to disregard and attempt to vacate and set aside some of the provisions of the will of said George Pomeroy, and certain provisions of the will of said Edward Pomeroy; but that in fact and in truth the agreement actually made between the parties did not contemplate or require any such disregard, vacation, or setting aside, but was in complete and perfect harmony therewith, and all such expressions in said document are mere surplusage, and may be rejected as of no force or effect, without in any manner impairing the proper sufficiency and force of said agreement or of said document."

Then follows a somewhat specious, but unsatisfactory, argument to show that the agreement can be carried out in all its parts without interfering with the dispositions of the will. But the declaration means something. It indicates a consciousness that the idea of not disturbing the will by anything in the agreement had been prominently held up before the minds of the defendants; a consciousness that that impression had been made upon them, and could not be ignored.

If, then, as has been stated, it would be inequitable to carry out and enforce the agreement further than it has already been executed by the parties themselves, and executed largely to the detriment of the defendants, the question arises whether any other relief can properly be granted upon the frame of the bill. If the agreement is an inequitable one, and cannot justly be enforced, and if, as both parties admit in their pleadings, it was not intended to disturb the provisions of George Pomeroy's will, there is nothing to be done but to fall back upon that will, and to ascertain whether upon the bill of complaint as framed any decree for relief ought to be made. In addition to an express prayer for the specific performance of the agreement, the bill prays that the defendants may be required to account for all money, securities, and property of every kind received by them either from the estate of their father under his will, or from that of Edward under the agreement referred to; and that each of them may be charged with the $50,000 invested or to be invested in trust for her out of the sales of real estate. It prays for a decree giving to George P. Pomeroy's estate, represented by complainant, one-third part of the whole estate, including said trust fund, and to include in such third part the securities which constituted the trust fund of $30,000 invested for George P. Pomeroy during his life, which by their father's will went to the defendants after George's death, as survivors of

their brother Edward. It is evident that these prayers are founded on the hypothesis that the agreement on which the bill is primarily founded will be carried out by a decree for specific performance, and they require no further consideration. The bill also prays that Alfred Mills, the executor, after completing, by sales of real estate, the trust fund of $100,-000 in favor of the defendants, may be directed to realize from further sales the sum of $20,000, to be paid over to the complainant, to make, with the trust fund of $30,000 before referred to, the proper equivalent, under said agreement, of the trust fund raised for the defendants, and that when this has been done the executor report to the court what estate shall then remain undisposed of, and that then the parties, said complainant, Julia, and Josephine, have opportunity to agree upon a partition of the residue, and, if they fail to agree, that the executor be directed to sell such residue, and divide the proceeds according to said agreement. This prayer is also based on the same hypothesis of a decree for specific performance of the agreement referred to, and may be passed over. The bill then prays for the appointment of a receiver, to receive and manage all the property; but all upon the same hypothesis. The only other prayer is one for general relief. It is not too much to say that the whole frame, scope, and object of the bill is to obtain a decree for a specific performance of the agreement set forth therein, either the agreement to be deduced from the preliminary negotiations and correspondence, or that contained in the document afterwards prepared and executed. As I have already expressed my views as to that agreement, and my conviction that no relief based upon it can be given, it follows that the bill ought to be dismissed. Even if the scope of the bill was broad enough to require it, it is difficult to see what the court could do to aid in carrying the will into execution. Nearly all of its provisions have already been executed. The complainant himself in his bill makes the following statement:

"And your orator further shows that, except the completion of said trust fund of one hundred thousand dollars from the sales of real estate, the special bequests and provisions of said will were executed long prior to the filing of this bill of complaint; and that the residue of the personal estate of said George Pomeroy was, soon after his decease, delivered to, and for the most part equally divided among, the said children, Edward, Julia, and Josephine."

As to the trust fund of $100,000, it is shown that it has been completed by the executor by sales of real estate since the commencement of this suit, and that the money has been invested as required by the will, and the executor has given notice to the other parties in the case of a motion that the bill be dismissed as to him. No objection is made to this motion, except that the solicitors of the complainant think that he ought to file a schedule or inventory of the real estate which still remains undisposed of, and to continue in readiness to make any other sales that may be required of him. As to the other part of the allegation made in the above extract from the bill,—that the residue of the personal estate of George Pomeroy was, soon after his decease, delivered to, and for the most part equally divided among, the said children, Edward, Julia, and

Josephine,—it is only true as to the division which took place in May, 1887. Up to the death of Edward he had never settled with his sisters, and, as already seen, they had commenced suits against him for a settlement. But the division referred to, made in May, 1887, was undoubtedly intended to be a final division of the personal property belonging to the estate, excepting such as was appropriated to particular trusts by the will. That division, in my view, was a mutual and final settlement of the personal estate, and of all claims against each other for moneys received; and as to the trust funds, the will of George Pomeroy gives them to the defendants, and they are not under any obligation to render any account thereof. As to the real estate now left undisposed of, the title stands as the will directed it should, the fee being vested in three equal undivided parts in the two defendants and the infant son of George P. Pomeroy, as the representative of Edward, as tenants in common in fee, except that, by the will of George P. Pomeroy, the infant's estate is defeasible, and passes over to other parties, by way of executory devise, in case he should die before 21.

Since the commencement of this suit, Josephine Pomeroy, one of the defendants, has filed a bill in the court of chancery of New Jersey against the complainant, and the other parties interested in the real estate whereof said George Pomeroy died seised, praying for a partition, or sale and division of proceeds, of the same. And the said Josephine, together with said Julia Pomeroy Morrison and her husband, William F. Morrison, have also commenced a similar suit in the circuit court of the city of St. Louis, in the state of Missouri, to obtain a partition of certain lands and real estate whereof said George Pomeroy died seised situated in St. Louis. And a similar suit has been commenced by said Julia Pomeroy Morrison in the supreme court of New York for Queens county to procure a like partition of lands whereof said George Pomeroy died seised in the state of New York. The complainant has presented a supplemental bill in the present suit to enjoin the said parties from proceeding with the said suits, and praying that the said executor, Alfred Mills, may be required to file an inventory of all the lands and real estate whereof the said George Pomeroy died seised, wheresoever situated, and to state specifically what lands he has sold; also praying that this court will proceed to cause a just and equitable partition of all said residue of said estate among the parties thereto, or a sale and division of the proceeds. This supplemental bill was entertained for the purpose of the injunction prayed for, (for which a mere petition would have been sufficient,) and a temporary injunction was granted, in order to prevent any embarrassment that might arise, during the pendency of the present suit, from a conflict of jurisdiction. But it was not intended to sanction a supplementary proceeding which would have the effect of changing the whole object of the suit, and turn it into a suit for partition. If any such order was made, it was inadvertently done; though I have no recollection that any was made. No decree for partition was asked for in the original bill, but, as already stated, the entire relief sought was based on the hypothesis of a specific performance of the

agreement relied on. Under that aspect the bill prayed for a decree of sale and a division of proceeds in case the parties themselves could not make an amicable partition. I do not think that the supplemental bill ought to be allowed for the purpose of decreeing a partition. Proceedings for partition were commenced in the court of chancery for New Jersey before any application or prayer for that purpose was made in this suit; and probably they can be conducted with greater facility in that court, under the provisions of the state statutes, than they can in this; and as to the lands and real estate in New York and Missouri, this court has no jurisdiction over them. Nor do I think that the court is called upon to hold the supplemental bill for the purpose of requiring the executor to file an inventory of the lands, or of directing him about selling and conveying them. He is primarily amenable in his character of executor and trustee to the orphans' court of the county of Morris, N. J.; and he has represented, and it is not disputed, that he has rendered his account to that court, and all the parties interested, including the complainant, were cited to appear and show cause why said account should not be confirmed, and did appear accordingly, and the account was duly confirmed without exception. If the executor should hereafter refuse to perform any duty imposed upon him by the will in regard to selling the remaining lands of the estate in New Jersey, the matter can be more properly considered in a proceeding to be instituted for that purpose. The bill and supplemental bill are dismissed, with costs.